UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ISIDORO DELEON,

Plaintiff,

DECISION AND ORDER
05-CV-6682 CJS

-v-

ELIZABETH HOFFMAN, et al.,

Defendants.

APPEARANCES

For Plaintiff:          Isidoro Deleon, *pro se*
                        93-A-3163
                        Shawangunk Correctional Facility
                        P.O. Box 700
                        Shawangunk, New York 12589


For Defendants:         Gary M. Levine, Esq.
                        Assistant Attorney General
                        Office of the New York State Attorney General
                        144 Exchange Boulevard, Suite 200
                        Rochester, New York 14614

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 1983, in which Isidoro Deleon

("Plaintiff"), a  prison inmate, proceeding *pro se*, is suing various employees of the New

York State Department of Corrections and Community Supervision ("DOCCS") who were

employed at Wende Correctional Facility ("Wende") and Elmira Correctional Facility

("Elmira").  Now before the Court are the following applications: 1) Defendants' Motion for

Summary Judgment (Docket No. [#109]); 2) Plaintiff's Motion to Strike/Motion for Summary

Judgment [#122];  3) Plaintiff's Motion for Summary Judgment [#123]; and 4) Plaintiff's

Motion for Default Judgment [#134].  Defendants' motion for summary judgment [#109] is granted, Plaintiff's cross-motions [#122, 123, 134] are denied, and this action is dismissed with prejudice.

BACKGROUND

Plaintiff's Fifth Amended Complaint [#105] purports to state eleven (11) separate claims against the Defendants.  Claims 1-6 pertain to incidents at Wende, while claims 7-11 pertain to incidents at Elmira.  All but one of the claims involve Plaintiff's belief that Defendants tampered with his mail in order to retaliate against him.  The last claim alleges that Defendants conspired to issue a false misbehavior report against him in order to retaliate against him.

Unless otherwise noted, the following are the facts of the case viewed in the light most-favorable to Plaintiff.  At all relevant times, Defendants were employed by DOCCS in the following capacities: Elizabeth Hoffman ("Hoffman") was Senior Mail and Supply Clerk of the Mail Room at Wende; Faith VanDaley ("VanDaley") was Acting Senior Mail and Supply Clerk of the Mail Room at Wende; Donna Reinhardt ("Reinhardt") was Mail and Supply Clerk of the Mail Room at Wende; William Chevers ("Chevers") was Legal Mail Correction Officer at Wende; Diane Catalfu ("Catalfu") was Supervisor of the Mail Room at Wende; Michael Walter ("Walter") was Supervisor of Inmate Accounts at Wende; Anthony Zon ("Zon") was Superintendent of Wende; Renee Gates ("Gates") was Senior Mail and Supply Clerk of the Mail Room at Elmira; Janet Geiger ("Geiger") was Senior Mail and Supply Clerk of the Mail Room at Elmira; Andrew Shaw ("Shaw") was Supervisor of the Mail Room at Elmira until May 25, 2006; and William Bills ("Bills") was Supervisor of the Mail Room at Elmira from May 25, 2006 until August 21, 2007.

2

Claim 1

On March 23, 2003, Plaintiff sent a letter and institutional check for $105.00 to the U.S. District Court for the Northern District of New York,  to pay the cost of an appeal to the Second Circuit in case number 01-CV-1536.   Plaintiff also sent a copy of his letter to the attorney for the defendants in that action, Senta Siuda ("Siuda").   The docket sheet for case number 01-CV-1536 indicates that the Northern District received Plaintiff's payment on April 3, 2003. *See*, [#30] at p. 28.   Nevertheless, Plaintiff believed that someone in Wende's mail room had confiscated his letter to the court, because he did not receive a response from either the court or Siuda.  *See*, Fifth Amended Complaint ¶ 27 ("[T]he delay in receiving an answer to the letters in question above, led me to suspect that defendants Hoffman, VanDaley, Reinhardt, Chevers, and Catalfu with deliberate indifference, maliciously and sadistically  were withholding, opening, reading and destroying said letters to cause a dismissal of the above named civil action.").   Ignorant of the fact that his letter had indeed been received by the Northern District, Plaintiff wrote letters to the mail room staff, accusing them of tampering with his mail.  Plaintiff also filed an inmate grievance, which, after it was denied, he appealed to Zon, and then to DOCCS' Central Office Review Committee ("CORC").

Claim 2

On April 30, 2003, Plaintiff mailed an appeal brief to the Second Circuit, concerning case number 01-CV-1536.  Plaintiff also mailed a copy to Siuda.  Plaintiff sent both pieces of mail by certified mail, return receipt requested.   The Second Circuit's docket sheet indicates that the court filed Plaintiff's submission on May 15, 2003. See, [#30] at p. 33. Nevertheless, when Plaintiff did not receive a return receipt, he concluded that staff in

Wende's mail room had tampered with his mail. *See*, Fifth Amended Complaint ¶ 53 ("[B]y the delay without providing me such receipt I suspected that something wrong was going on."). Plaintiff wrote to Hoffman asking her about the receipts as to the Second Circuit and Siuda, but he maintains that she ignored him. Plaintiff subsequently filed an unsuccessful grievance, which he eventually appealed to Zon and then to CORC.

Claim 3

On March 17, 2003, Plaintiff sent a letter to the New York City Clerk, along with a check for $5.00, requesting a search of the City's marriage records. Plaintiff was seeking a copy of his own marriage record, because he intended to file a divorce action against his wife. After eight months, Plaintiff had not received a response from the New York City Clerk. Moreover, on November 17, 2003, he received a notice from Wende informing him that the check for $5.00 was being deposited back into his inmate account. From these facts, Plaintiff concluded that staff in Wende's mail room had interfered with his mail. *See*, Fifth Amended Complaint [#105] at ¶¶ 64-67. Subsequently, Plaintiff received a response from the New York City Clerk, informing him that the current cost for a search of marriage records was $15.00, not $5.00, and that his check for $5.00 had been returned to him. *Id.* at ¶ 70. Consequently, it appears that the $5.00 which was deposited in Plaintiff's account was the check that was returned by the New York City Clerk. On January 18, 2004, Plaintiff sent another request to the New York City Clerk for a search of the City's marriage records, along with a check for the correct amount of $15.00. On January 29, 2004, the New York City Clerk returned the correspondence to Plaintiff, and indicated that he also needed to submit a photo ID along with his request. On February 10, 2004, Plaintiff resubmitted his request to the New York City Clerk, along with a photocopy of his ID. As of August 2004,

4

Plaintiff apparently had not received a response from the New York City Clerk, so he asked Catalfu whether there was any record of a reply having been received at Wende. Catalfu advised Plaintiff that, according to Wende's records, on April 26, 2004, Plaintiff had received two pieces of mail, one from the New York City Clerk and one from the U.S. District Court. Plaintiff maintains that he never received either piece of mail. Reinhardt later informed Plaintiff that, according to Wende's records, the mail had probably been returned to sender, since Plaintiff had refused it. Plaintiff denies having received the mail, and blames Chevers for failing to deliver it to him. Plaintiff filed two unsuccessful grievances, and Zon denied Plaintiff's appeal. On September 29, 2004, Plaintiff sent another letter to the New York City Clerk, inquiring about his earlier correspondence, but received no response. Plaintiff therefore believes that Defendants tampered with his mail, and prevented him from commencing his divorce action. *See*, Fifth Amended Complaint ¶ 91 ("As no response was received by me . . . I set forth that such letters or its responses were with deliberate indifference . . . withheld and destroyed by the defendants[.]")

Claim 4

On November 12, 2003, Plaintiff sent an application to Wende's Parole Office, requesting a copy of his social security card. Plaintiff maintains that he intended to use the social security information as part of his divorce lawsuit. As of August 2004, Plaintiff indicates that he had not received a response, so he sent another such request to Wende's Parole office. On September 9, 2004, Plaintiff received a response from the Parole Office, which indicated that the Parole Office had responded to his initial request on November 12, 2003, the same day that it received the request, and that it had advised him that he could not obtain a copy of his social security card. Plaintiff maintains that he never received such

response.  Plaintiff wrote to Zon about the situation, but Zon took  no action.  From these

facts, Plaintiff concludes that the Wende Defendants tampered with his mail and hindered

his ability to commence his divorce action.

Claim 5

On August 8, 2004, Plaintiff mailed a catalog order to the Eastbay clothing company,

along with a disbursement form for $36.98.  The disbursement form had to be processed,

so that the payment could be deducted from Plaintiff's inmate account.[1]  On August 29,

2004, Plaintiff contacted the Inmate Accounts office to inquire about his request.  The same

day, Wende's Package Room staff returned Plaintiff's correspondence to him, with the

direction, "Need envelope and stamp."  Fifth Amended Complaint ¶ 104.  Plaintiff contends

that the Package Room staff were improperly tampering with his mail, because he had

already included a stamped, addressed envelope.  Plaintiff sent a letter to Zon about the

incident, but Zon took no action.  Plaintiff also filed an unsuccessful grievance, the denial

of which Zon affirmed.  Plaintiff's catalog request was apparently processed and mail out

by Wende Staff on September 12, 2004.  Plaintiff contends that the Wende Defendants are

liable for delaying his mail.

Claim 6

On September 26, 2004, Plaintiff filed an inmate grievance, alleging that he had been

assaulted by corrections officers and issued a false misbehavior report.   The Inmate

---

[1]Catalfu describes the procedure as follows: "If the inmate needs a check written to go with the letter, the inmate would have a completed disbursement form attached to the envelope and the form is sent to Inmate Accounts for approval.  If the check is approved, the form goes to the Cashier's Office to write the check, then to the Steward's Office for the signing of the check and then back to the Mail Room.  Once back at the mail room the mail is put with the outgoing mail and then transported to the post office." Catalfu Affidavit [#113] at ¶ 5.

6

Grievance Review Committee ("IGRC") denied the grievance, and on October 27, 2004, Zon affirmed the denial. However, Plaintiff maintains that he did not receive Zon's written decision. On November 30, 2004, Plaintiff learned that Zon had issued a written decision a month earlier. Plaintiff filed a grievance concerning the incident, the denial of which Zon affirmed. Plaintiff maintains that the Wende Defendants are liable for tampering with his mail and confiscating Zon's initial response.

Claim 7

On July 27, 2005, Plaintiff was transferred to Elmira. Plaintiff alleges, in conclusory fashion, that Gate, Geiger, Shaw, and Bills began a campaign of retaliation against him, which consisted of them reading and destroying his mail. The Fifth Amended Complaint does not provide any details about the alleged retaliation. On November 23, 2005, Plaintiff commenced the instant action against Hoffman, VanDaley, Reinhardt, and Chevers. On November 30, 2005, the Court issued an Order [#4], informing Plaintiff that he would need to re-submit his application to proceed *in forma pauperis*, along with a properly-executed form authorizing the Court to deduct the filing fee from his inmate account. Defendant maintains that *someone* at Elmira opened and read the Court's correspondence outside of his presence. *See*, Fifth Amended Complaint ¶ 121 ("Defendants Gates, Geiger or somebody else acting on their behalf and under the supervision of defendant Shaw . . . sadistically opened and read the Hon. Siragusa's [Order.]"). Plaintiff further maintains that whoever read his mail became aware that Plaintiff's lawsuit would be dismissed if he failed to comply with the Court's order, and that such person or persons plotted to cause such dismissal. *See, id*. at ¶ 124. On December 6, 2005, Plaintiff contends that he sent the authorization form to the Court. He maintains, though, that someone at Elmira confiscated

7

his letter, which caused this lawsuit to be dismissed.  In fact, on February 17, 2006, the

Clerk of the Court  terminated this action, apparently because he believed that Plaintiff had

not complied with the Court's previous Order.  *See*, [#5].  In this regard, Plaintiff blames

Defendants for causing such dismissal.  However, on May 9, 2006, at Plaintiff's request, the

Court re-opened this action. See, Order [#7].  Significantly, the Court indicated that the

dismissal of the action had been in error, since the Court had received Plaintiff's

authorization form by February 7, 2006, which was the deadline set by the Court. *Id*.

Accordingly, Plaintiff is mistaken in believing that Defendants destroyed his correspondence

to the Court.  In that regard, Plaintiff misunderstands the reason why the Court re-opened

the action, because he states: "[O]n May 9, 2006, the Hon. Siragusa reopened the case .

. . because he found that the Plaintiff actually did submit such documents to the Court by

the date ordered, *but they were not received by the Court*." Fifth Amended Complaint ¶ 133

(emphasis added).  Actually, the Court did receive Plaintiff's submission, and this fact is

established by the return receipt that Plaintiff submitted to the Court in support of his

application to reopen the action. *See*, [#6] at p. 7.  Accordingly, it is clear that Defendants

did not prevent Plaintiff's submission from being mailed, as he now claims.

<u>Claim 8</u>

On or about July 5, 2006, one of Plaintiff's co-defendants, from the prosecution for

which he is currently incarcerated, sent mail to Plaintiff at Elmira.  Specifically, Plaintiff

maintains that "Mr. Rafael Martinez [("Martinez")] sent a mail to Plaintiff from 2331 94th

Street Apt. 2A, East Elmhurst, New York 11369."[2] Fifth Amended Complaint ¶ 134.

---

[2]It seems unlikely that Mr. Martinez mailed anything from a private address in East Elmhurst in 2006, since in 1993 he began serving a lengthy (213 years to life) sentence in DOCCS custody for his involvement in the Jheri Curls drug-trafficking gang, of which Plaintiff was also a member. *See, e.g., Martinez v.*

According to Plaintiff, the letter contained "exculpatory affidavits" belonging both to Plaintiff and Martinez.  Someone at Elmira returned the mail to Martinez, pursuant to facility rules, since it contained information pertaining to another inmate.  Plaintiff does not know who returned the mail to Martinez. *See, id*. at ¶ 136 ("Defendants Gates, Geiger, Bills *or somebody else acting on their behalf* . . . maliciously and sadistically withheld, opened, read and returned said mail back to Mr. Martinez[.]") (emphasis added).  Plaintiff wrote to Gates about the issue, but Gates responded that "[i]nformation concerning other inmates is usually considered contraband and not allowed." Id. at ¶ 138.  Gates also indicated that an inmate could permissibly possess mail concerning a co-defendant, but that there was no indication on Martinez's letter that he was Plaintiff's co-defendant, nor was the letter marked as "legal mail."  Plaintiff nevertheless alleges that he was entitled to possess information concerning another inmate co-defendant, and that the return of the mail was in violation of DOCCS rules.  Plaintiff filed an inmate grievance, which was denied.  Subsequently, several years later in January 2010, while Plaintiff was housed at Shawangunk Correctional Facility, he received the affidavits in the mail from Martinez's mother. *Id*. at ¶ 146.  Plaintiff maintains that he used the information to file a collateral attack on his conviction and sentence in New York State Supreme Court, claiming actual innocence, but the court denied his application because he failed to explain why he had waited four years to submit Martinez's affidavit to the court. *See, id*. at ¶ 147.[3]  Plaintiff therefore maintains that Gates, Geiger, and Bills are

---

*Senkowski*, No. 02 Civ. 0009 (LTS) (KNF), 2005 WL 6206922 (S.D.N.Y. May 5, 2005).

[3]For example, Plaintiff offers no explanation for why he did not simply ask Martinez to re-send the information in an envelope marked "legal mail" and/or which identified himself as Plaintiff's co-defendant. Plaintiff's suggestion that the return of Martinez's letter prevented him from filing his CPL § 440 motion for more than three years is frivolous.

responsible for the denial of his state-court collateral attack.  However, the Court observes that Plaintiff was transferred to Shawangunk from Elmira in or about February 2007.  *See*, docket note dated 2/16/2007, indicating Plaintiff's new address at Shawangunk. Accordingly, it is clear that the Elmira Defendants could not have been responsible for preventing Plaintiff from obtaining the allegedly-exculpatory information from Martinez during the three years prior to him commencing his state-court collateral attack in 2010.  Nor is there any indication that Defendants prevented Plaintiff from asking Martinez to re-send him the affidavits while he was still at Elmira.

Claim 9

On August 3, 2006, Plaintiff mailed a letter to this Court, certified mail, return receipt requested.  Plaintiff alleges that someone in Elmira's mail room delayed the mailing of his letter by seven (7) days. *See*, Fifth Amended Complaint at ¶ 150 ("Gates, Geiger, Bills *or somebody else acting on their behalf* . . . sadistically withheld unprocessed the Plaintiff's certified mail of 8/3/06 by seven (7) days in the Mail Room of Elmira C.F.") (emphasis added).  When Plaintiff did not immediately receive a return receipt, he wrote to Gates, who responded that the U.S. Postal Service did not process Plaintiff's mail until August 10, 2006. Id. at ¶ 152.  Plaintiff filed a grievance, which was denied.  Plaintiff reiterates that "Gates, Geiger, Bills or somebody else" delayed his outgoing legal mail, thereby  "caus[ing] him problems with his legal matters." *Id*. at ¶ 155.

Claim 10

Plaintiff alleges that on three occasions in 2006 (February 2006, May 18, 2006, and August 29, 2006) he sent mail to the New York Court of Claims, and sent a copy to an Assistant Attorney General.  Fifth Amended Complaint at ¶¶ 156-157.  On March 29, 2006,

Plaintiff also sent correspondence to the National Lawyers Guild. Id. at ¶ 159.   Plaintiff did

not receive a response to any of this corrrespondence, so he believes that Gates, Geiger,

Shaw, and Bills, "or someone else acting on their behalf," destroyed his mail.  Id. at ¶ 158,

161.   On October 3, 2006, Plaintiff sent another letter to the National Lawyers Guild.

However, two weeks later the mail was returned to him, with the notation, "Not deliverable

as addressed and unable to forward." Id. at ¶ 163.   Plaintiff again blames Gates, Geiger,

Shaw, Bills, or "someone else" at Elmira for causing his mail to be returned.   In addition, in

2006 Plaintiff mailed various correspondence to female acquaintances and a prison dating

service, but received no responses. Id. at ¶ ¶ 164-170.   One of the pieces of mail sent to

a female acquaintance was returned to Plaintiff marked, "Return to sender, not deliverable

as addressed, unable to forward." Id. at ¶ 170.   Plaintiff contends that such notation was

false, since the female acquaintance still resides at her same address. Id. at ¶ 170.   It

seems clear, though, that such notation was made by the U.S. Postal Service, not the staff

at Elmira. See, Gates Aff. [#116], Exhibits, photocopy of returned letter addressed to Tarma

Oyiedo.

Claim 11

On January 11, 2007, Corrections Officer Chris Whitson ("Whitson") issued Plaintiff

a misbehavior report, for allegedly stalking and harassing a female nurse, Shawna Howell

("Howell").   Plaintiff maintains that Whitson and Howell were "coerced" into filing a false

misbehavior report against him by Defendants "or by somebody else acting under their

supervision," in order to retaliate against him for filing grievances. Fifth Amended Complaint

at ¶ 178.   A disciplinary hearing was held, at which Whitson and Howell testified, and the

hearing officer found Plaintiff guilty of harassment, but not guilty of stalking.  Fifth Amended

Complaint at ¶ ¶ 175-183.  Neither Whitson, Howell, nor the hearing officer is a party to this action.   Instead, Plaintiff contends that "Gates, Geiger and Bills, or somebody else acting under their supervision," orchestrated the false misbehavior report against him in order to retaliate against him. *See, id*. at ¶ 185.

<u>The Subject Motions</u>

Following the completion of pretrial discovery, on  February 23, 2011 Defendants filed the subject motion for summary judgment [#109].[4]  Defendants primarily argue that Plaintiff cannot establish his claims because he has no evidence that any Defendant actually tampered with his mail or otherwise retaliated against him.   In that regard, Defendants cite various portions of Plaintiff's deposition testimony, in which he admits that he has no personal knowledge of acts by the Defendants. *See*, Memo of Law [#121] at pp. 2-4.  With regard to the "denial of access to the courts" claim, Defendants further contend that Plaintiff cannot show that any of the alleged acts by Defendants actually affected the outcomes of his legal actions.   Defendants also argue that there is no evidence of record to support Plaintiff's claim of retaliation.  In addition, Defendants state that claims 1-3 should be dismissed as against Zon, Catalfu, and Walter, since they are time-barred by Section 1983's three-year statute of limitations.   In support of the application, each Defendant has submitted an affidavit, specifically denying that they tampered with Plaintiff's mail or otherwise retaliated against him. *See*, Docket Nos. [#112-120].[5]

---

[4]Defendants provided the *pro se* Plaintiff with the *Irby* notice required by Local Rule of Civil Procedure 56.2. *See*, Docket No. [#111].

[5]For example, Geiger indicates that she was not even working in the mail department in 2005 and 2006. See, Geiger Aff. ¶ 3.  Similarly, Hoffman indicates that she did not work in the mail room between June 2003 and November 2003, and that in August 2004 she went on sick leave until her retirement. Hoffman Aff. [#118].

On March 22, 2011, Plaintiff responded by filing the subject cross-motion to strike and for summary judgment [#122].   In it, Plaintiff argues that Defendants' motion for summary judgment should be stricken as having been filed in bad faith.   On this point, Plaintiff argues that Defendants' affidavits "are not supported by an irrefutable material evidence." [#122] at 4.[6]  Plaintiff also objects to the inclusion, in Defendants' Memo of Law, of a reference to a similar lawsuit which Plaintiff filed in the Northern District of New York, complaining about other instances of alleged mail tampering.  Defendants' memo indicates that the Northern District dismissed Plaintiff's lawsuit and sanctioned him for making false statements. *See*, Memo of Law [#121] at 1; *see also,  Deleon v. Doe*, 361 F.3d 93 (2d Cir. 2004).   Defendants  do  not  explain  how  such  decision  is  relevant  to  this  lawsuit. Accordingly, the Court will disregard that portion of Defendants' papers as being irrelevant.

On March 28, 2011, Plaintiff filed the subject cross-motion for summary judgment [#123].  In support of the motion, Plaintiff essentially reiterates the statements in the Fifth Amended Complaint.  Plaintiff also refers generally to various exhibits which were already filed with the Court in this action.  On April 21, 2011, Plaintiff filed a supplement to his cross-motion. *See*, Docket No. [#129].  The purpose of the supplement was to inform the Court that, in connection with his dismissed CPL § 440 collateral attack, the New York Court of Appeals had denied him leave to appeal.  On May 11, 2011, Plaintiff filed a memo of law

---

[6]Plaintiff also complains that Defendants affidavits are signed electronically, instead of in the Defendants' own handwriting.  However, Defendants' electronic signatures are in accordance with the Court's CM/ECF Administrative Procedures, § 2(g)(I) ("If the original document requires the signature of a non-attorney, the filing party shall obtain the signature of the non-attorney on the document.  The filing party or attorney then shall file the document electronically indicating the signatory's name in the form 's/(name).'") Plaintiff has not raised any good-faith objection to the authenticity of Defendants' signatures.

and statement of facts[7] [#131] in further support of his application.[8] The memo of law essentially mirrors the Fifth Amended Complaint, in that it consists of bald accusations and legal jargon.  At most, Plaintiff argues that he had "allege[d] a chronology of events from which retaliation may be plausibly inferred." Pl. Memo of Law [#131] at 19.

On August 8, 2011, while the aforementioned motions were under consideration by this Court, Plaintiff filed a motion for default judgment [#134], based on the mistaken understanding that Defendants were required to file a response to his cross-motions, and that their failure to do so entitled him to judgment.  However, Defendants were entitled to rely on their motion for summary judgment, and their decision not to file a separate response to Plaintiff's cross-motions does not constitute a default.

DISCUSSION

Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157 (1970).  "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, §

---

[7]The purported Rule 56 Statement of Facts essentially repeats the allegations in the Fifth Amended Complaint.

[8]In addition to alleging, in conclusory fashion, that Defendants retaliated against him for filing grievances, Plaintiff now adds, again with no support, that Defendants sought revenge against him "for being spanish." Memo of Law [#131] at 1; *see also*, Pl. Rule 56 Stmt. at p. 12, ¶ j ("[D]efendants were unlawfully tampering with the plaintiff's mail as a 'Racial Discrimination' to impeded his communications with his spanish people."). However, there is no claim, nor any evidentiary support, in this action for discrimination based on Plaintiff's race or national origin.  Plaintiff also adds an argument that the dismissal of his CPL § 440 collateral attack, for which he blames Defendants, deprived him of the right to be married, which violates his constitutional right to marry. *See, id*. at p. 15.  These arguments, which Plaintiff has come up with in a last-ditch attempt to avoid summary judgment, reflect the frivolous nature of this action.

56.11[1][a] (Matthew Bender 3d ed.).  "In moving for summary judgment against a party

who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by

pointing to an absence of evidence to support an essential element of the nonmoving

party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996) (*citing Celotex

Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).

      The underlying facts contained in affidavits, attached exhibits, and depositions, must

be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369

U.S. 654, 655 (1962).  Summary judgment is appropriate only where, "after drawing all

reasonable inferences in favor of the party against whom summary judgment is sought, no

reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988

F.2d 303, 308 (2d Cir.1993).  Moreover, since Plaintiff is proceeding *pro se*, the Court is

required to construe his submissions liberally, "to raise the strongest arguments that they

suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994).

      Plaintiff is suing pursuant to 42 U.S.C. § 1983, and the legal principles generally

applicable to such claims are well settled:

> In order to establish individual liability under § 1983, a plaintiff must show (a)
> that the defendant is a "person" acting "under the color of state law," and (b)
> that the defendant caused the plaintiff to be deprived of a federal right. See,
> *e.g., Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).
> Additionally, "[i]n this Circuit personal involvement of defendants in alleged
> constitutional deprivations is a prerequisite to an award of damages under
> § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977).
>
>                ***
>
> An individual cannot be held liable for damages under § 1983 "merely
> because he held a high position of authority," but can be held liable if he was
> personally involved in the alleged deprivation. *See Black v. Coughlin*, 76 F.3d
> 72, 74 (2d Cir.1996). Personal involvement can be shown by: evidence that:
> (1) the defendant participated directly in the alleged constitutional violation,
> (2) the defendant, after being informed of the violation through a report or
> appeal, failed to remedy the wrong, (3) the defendant created a policy or

> custom under which unconstitutional practices occurred, or allowed the
> continuance of such a policy or custom, (4) the defendant was grossly
> negligent in supervising subordinates who committed the wrongful acts, or
> (5) the defendant exhibited deliberate indifference ... by failing to act on
> information indicating that unconstitutional acts were occurring. *See Colon
> v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995).

*Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122, 127 (2d Cir. 2004);

*see also, Platt v. Incorporated Village of Southampton*, 391 Fed.Appx. 62, 2010 WL

3393738 at *3  (2d Cir. Aug. 30, 2010) ("A supervisory official may be personally liable if

he or she has actual or constructive notice of unconstitutional practices and demonstrates

gross negligence or deliberate indifference by failing to act.  Supervisory liability may be

imposed where an official demonstrates gross negligence or deliberate indifference to

constitutional rights by failing to act on information indicating that unconstitutional practices

are taking place.  We cannot say, however, that an allegation that a supervisory official

ignored a letter protesting past unconstitutional conduct is, without more, sufficient to state

a claim that the official was 'personally involved' in the unconstitutional conduct.") (citations

and internal quotation marks omitted).[9]  It is well settled that "mere linkage in the prison

chain of command is insufficient to implicate . . . a prison superintendent in a § 1983

claim." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).

Plaintiff alleges that Defendants retaliated against him by interfering with his mail,

including his legal mail.  The legal principles applicable to such claims are clear:

---

[9]Following the Supreme Court's decision in *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1948 (2009), there is some disagreement among district courts in this Circuit as to whether all of the foregoing "*Colon* factors" still apply. *See, e.g., Dilworth v. Goldberg*, 2011 WL 3501869 at * 17 (2d Cir. Jul. 28, 2011) ("*Iqbal* has caused some courts to question whether all five of the personal involvement categories survive that decision.") (collecting cases).  It is unclear whether *Iqbal* overrules or limits *Colon*, therefore, in the absence of contrary direction from the Second Circuit, the Court will continue to apply those factors. *See, Platt v, Incorporated Village of Southampton*, 391 Fed.Appx. 62, citing *Back v. Hastings on Hudson Union Free Sch. Dist.*, which sets forth all five of the *Colon* bases for imposing supervisory liability.

Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution. To state a claim for denial of access to the courts-in this case due to interference with legal mail-a plaintiff must allege that the defendant "took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' " *Monsky v. Moraghan*, 127 F.3d 243, 247 (2d Cir.1997) (citing *Lewis v. Casey*, 518 U.S. 343, 351, 116 S.Ct. 2174, 2180, 135 L.Ed.2d 606 (1996)); *see also Cancel v. Goord*, No. 00 Civ.2042, 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) ("[I]n order to survive a motion to dismiss a plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim.") (citing *Lewis*, 518 U.S. at 353, 116 S.Ct. at 2181).

In addition to the right of access to the courts, a prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment. *See Heimerle v. Attorney General*, 753 F.2d 10, 12-13 (2d Cir.1985); *Hudson v. Greiner*, No. 99 Civ. 12339, 2000 WL 1838324, at * 5 (S.D.N.Y. Dec.13, 2000). Restrictions on prisoners' mail are justified only if they "further[ ] one or more of the substantial governmental interests of security, order, and rehabilitation ...[and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir.1986) (internal citations and quotation marks omitted). In balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail. *See Thornburgh v. Abbott*, 490 U.S. 401, 413, 109 S.Ct. 1874, 1881-82, 104 L.Ed.2d 459 (1989); *Washington*, 782 F.2d at 1138-39; *Davidson v. Scully*, 694 F.2d 50, 53 (2d Cir.1982).

While a prisoner has a right to be present when his legal mail is opened, *Wolff v. McDonnell*, 418 U.S. 539, 574-76, 94 S.Ct. 2963, 2983-85, 41 L.Ed.2d 935 (1974), an isolated incident of mail tampering is usually insufficient to establish a constitutional violation. *See Morgan v. Montanye*, 516 F.2d 1367, 1371 (2d Cir.1975); *Washington*, 782 F.2d at 1139. Rather, the inmate must show that prison officials "regularly and unjustifiably

17

interfered with the incoming legal mail." *Cancel*, 2001 WL 303713 at *6 (citing *Washington*, 782 F.2d at 1139).

In *Washington*, we determined that as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received. 782 F.2d at 1139. Following *Washington*, district courts have generally required specific allegations of invidious intent or of actual harm where the incidents of tampering are few and thus the implication of an actionable violation is not obvious on its face. *See, e.g., Cancel*, 2001 WL 303713 at *6 (dismissing claim where only two incidents of tampering alleged and no other indications of a continuing practice); *John v. N.Y.C. Dep't of Corrections*, 183 F.Supp.2d 619, 629 (S.D.N.Y.2002) (requiring plaintiff to allege facts that show defendants acted with invidious intent and plaintiff was harmed by the interference); *Hudson*, 2000 WL 1838324 at *5 (same); *Johnson v. Morton*, No. 95 Civ. 949, 1996 WL 518078, at *1 (E.D.N.Y. Aug. 26, 1996) (noting that "[c]ourts have consistently applied *Morgan [v. Montanye]* to dismiss suits by inmates alleging unconstitutional opening of their legal mail without any showing of damages"); *see also Lewis*, 518 U.S. at 351, 116 S.Ct. at 2180 (holding that inmate must establish actual injury, rather than "theoretical deficiency" with legal library or legal assistance program to state constitutional claim for interference with access to courts).

*Davis v. Goord*, 320 F.3d 346, 351-352 (2d Cir. 2003). Moreover, "[m]ere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Id*. at 352 (citations and internal quotation marks omitted). To prevail on a mail tampering claim, a Plaintiff must demonstrate that a defendant caused such interference, and "wholly conclusory" allegations that a defendant delayed or opened his mail are insufficient. *Salahuddin v. Jones*, 992 F.2d 447, 449 (2d Cir. 1993); *see also, Brown v. Goord*, No. 9:04-CV-0785, 2007 WL 607396 at *14 (N.D.N.Y. Feb. 20, 2007) ("Plaintiff's sworn statement that Defendant Lynch 'confiscated' Plaintiff's mail is entirely

conclusory and not based on personal knowledge; as a result, it does not constitute evidence sufficient to oppose Defendants' motion for summary judgment.").

Plaintiff also maintains that Defendants retaliated against him because he filed inmate grievances.  In that regard,

> [c]ourts properly approach prisoner retaliation claims "with skepticism and particular care," because "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds by *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). *See also Phelps v. Kapnolas*, 308 F.3d 180, 187 n. 6 (2d Cir.2002). Thus, in order to survive a motion to dismiss a complaint, a plaintiff asserting First Amendment retaliation claims must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes*, 239 F.3d at 492.

*Davis v. Goord*, 320 F.3d at 352.  Filing a prison grievance is a constitutionally protected activity. *Id.*

In the instant case, at the outset the Court is mindful of the well-settled principle that "mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996).  Such statement of law is particularly applicable here, since Plaintiff's entire case is nothing more than "wholly conclusory" allegations, speculation, and conjecture.  Even liberally construing Plaintiff's papers to raise the strongest arguments that they suggest, which the Court is required to do, Plaintiff has not shown that any Defendant in this action did anything improper concerning his mail.  Nor has Plaintiff shown that any Defendant took any action

with a retaliatory motive.  Plaintiff's problem is not merely that he cannot show which Defendant tampered with his mail.  Rather, in most if not all of the instances he cites, he cannot even demonstrate that his mail was tampered with at all.  As just one example, Plaintiff continues to maintain that Defendants destroyed mail that he sent to this Court, which resulted in the temporary dismissal of this action, even though the record clearly indicates that the Court received his correspondence.[10]  To the extent that Plaintiff has shown any interference with his mail, it was minor, infrequent, and did not prejudice his ability to pursue legal action.  The Court has considered the entire record, and finds that Plaintiff has not produced sufficient evidentiary proof in admissible form to raise a triable issue of fact as to whether Defendants violated his federal constitutional rights in connection with the claims asserted in the Fifth Amended Complaint.  Accordingly, Defendants are entitled to summary judgment.

## CONCLUSION

Defendants' motion for summary judgment [#109] is granted, Plaintiff's cross-motions [#122, 123, 134] are denied, and this action is dismissed with prejudice.  The Court certifies that Plaintiff's claims are "frivolous, malicious, or fail[ ] to state a claim upon which relief may be granted," within the meaning of 28 U.S.C. § 1915A(b) and 28 U.S.C. § 1915(g).  The Court further certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962).  Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States

---

[10]As discussed above, the dismissal occurred because of the Court's error.  The Court rectified the error when it discovered that it had received Plaintiff's timely submission.

Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules

of Appellate Procedure.

SO ORDERED.

Dated:      January 10, 2012
            Rochester, New York

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge